PACIFIC GAS IMP. CO. v. ELLERT, Mayor, et al

(Circuit Court, N. D. California. October 15, 1894.)

1. NAVIGABLE WATERS—OBSTRUCTION.
    The provision in the act of admission of California into the Union, that all the navigable waters in the state should be common highways, and forever free, without tax therefor, does not refer to physical obstructions, but to political regulations. Bridge Co. v. Hatch, 8 S. Ct. 811, 125 U. S. 1, followed.

2. CIRCUIT COURTS—JURISDICTION—FEDERAL QUESTION.
    Under Act Aug. 13, 1888, giving circuit courts original jurisdiction of suits "arising under the constitution or laws of the United States," plaintiff's statement of his cause of action must show that he relies on some right under such constitution or laws, and a suggestion in his bill that defendant will claim that acts relied on by plaintiff violate the constitution of the United States cannot give jurisdiction. Tennessee v. Union & Planter's Bank, 14 S. Ct. 654, 152 U. S. 454, followed.

3. SAME—TAKING PROPERTY WITHOUT PROCESS.
    Const. 14th Amend., prohibiting a state from depriving a person of property without due process of law, applies to an act of any person by virtue of public position under a state government.

4. TIDE LANDS—DISPOSITION BY STATE—RIPARIAN RIGHTS.
    A state, if its laws permit, may dispose of its tide lands free from any easement of the upland owner.

5. SAME.
    The laws of California, as decided by its supreme court, allow it to make such disposition.

6. SAME—DEDICATION FOR STREETS.

    Acts Cal. March 11, 1858, and April 25, 1862, confirming an ordinance which adopted a plat laying out streets over tide waters, and declaring streets so laid out to be public streets, constitute a dedication by the state.

7. SAME.

    Const. Cal. art. 15, § 2, providing that no individual, partnership, or corporation claiming or possessing tidal lands of any navigable water shall be permitted to destroy or obstruct the free navigation of the water, does not prevent the state from establishing harbor lines, and authorizing the filling in of the space between such lines and the shore.

In Equity.

Suit by the Pacific Gas Improvement Company against L. R. Ellert, mayor of the city and county of San Francisco, and others, for injunction. Order to show cause why injunction should not be continued, discharged.

E. S. Pillsbury, John B. Mhoon, and Robert Y. Hayne, for complainant.

Garret W. McEnerney and W. S. Goodfellow, for respondents.

McKENNA, Circuit Judge. The bill alleges the incorporation of plaintiff, and the official character of defendant Ellert, mayor, and the other defendants, supervisors, and contains substantially the following allegations, omitting repetitions:

That the Central Gaslight Company is the owner in fee simple of block 330 in the city and county of San Francisco, having for its northern boundary the shore of the Bay of San Francisco, excepting a certain piece of land from said block, not necessary to describe.

That prior to the 31st of October, 1893, the said company was in possession of said property, using the same for gas works and appurtenances thereto, and leased the same to United Gas Improvement Company, of Pennsylvania, and the latter on the 16th of January, 1885, leased the same to plaintiff, and latter has been ever since, and is, in possession thereof.

That the land to the north of said block is owned by the state of California, and is continuously submerged at all stages of the tide, and navigable for vessels, boats, and water craft, and has always been a common and open public highway for the purposes of navigation, commerce, and traffic.

That said submerged land formerly belonged to Mexico, and was ceded to the United States by the latter, by treaty of Guadaloupe Hidalgo; and by the admission of the state of California into the Union the title to the same passed to the state, upon condition that "all the navigable waters within said state shall be common highways and forever free as well to the inhabitants of said state as to the citizens of the United States, without any tax, import or duty therefor," and ever since said act the title has continued in the state in trust as aforesaid.

That ever since said 16th of January, 1885, plaintiff has actively fulfilled the purposes of its incorporation, and has established and carries on a large and profitable business, and has used and uses the said land properly for the purpose of its business, and that the same is necessary and advantageous.

That it has a landing place thereon for vessels and boats, and by them brought the materials necessary for its business to said property, and that there is no other way in which they can be transmitted to said property than over said waters.

That on the 15th of September, 1893, the board of supervisors of San Francisco, assuming to act under an act of the legislature entitled "An act to provide work upon streets, lanes, alleys, courts, places and sidewalks, and for the construction of sewers within municipalities," approved March 18, 1885, and the acts amendatory and supplementary thereof, passed and

posted a resolution of intention to improve a pretended street, designated as "Lewis Street," and afterwards passed a resolution ordering work to be done, and invited proposals in the manner and, form required by law, and on the 25th of September, 1893, awarded a contract to a firm called "Warren & Malley," which was duly approved, is being posted and published as required by law, and that the posting and publishing will be complete on the 8th of October, 1893, unless restrained by injunction, and that defendant Ackerson will enter into a contract for the work with Warren & Malley or others, and said Warren & Malley or others immediately enter upon the construction of such improvements, and thereby destroy the said navigable waters and public highway, and destroy the said property and right of plaintiff.

That the district described in said resolution of intention lies immediately to the north of and in front of said property, and comprises the whole of the basin, inlet, or arm of the Bay of San Francisco, situated between what is known as the "Presidio Reservation," on the west of said basin, and what is known as the "Government Reservation," at Black Point, or the "Fort Mason Reserve," on the east, and is of triangular shape, and nearly a mile wide along the line of the proposed work to the furthest point of the shore.

That said district includes a portion of San Francisco Bay equal to about 100 acres, and which area has been from time immemorial navigable for vessels, boats, and water craft, and has constituted from time immemorial an open, common, public highway for navigation and commerce; and the water along the line of said street is 23 feet in depth at the lowest stage of the tide.

That said work will cut off the whole of said basin, including the part in front of plaintiff's property, from access to or communication with the other parts of the Bay of San Francisco, and will destroy the whole of said basin as a highway for vessels, boats, or water craft of any kind, and will cause your orator to transport its materials from distant places, for which plaintiff will have to pay large sums of money, which will absorb its profits; and no adequate compensation can be recovered at law, and the injury would be continuous, causing a multiplicity of actions; and that the navigability of said basin can never be restored; and that it is protected from the winds, and affords a haven and resting place and anchorage for vessels, etc., and renders the landing places along said basin, especially plaintiff's, of great value.

That said work is but part of the work contemplated by the board of supervisors to make solid ground of said basin, and to open and lay out over the same streets and highways, and that in so doing and intending the defendants, and each of them, claim and pretend that no part of the soil of said basin is, or for many years has been, owned or held by the state of California in trust for the purpose of commerce or navigation, or owned or held by said state for any purpose or in any way, but that nearly all of it is private property of one James G. Fair and others, and, being within the limits of the city and county of San Francisco, the board of supervisors has jurisdiction, under the said street law of San Francisco, to cause the same to be improved, graded, and filled up, and cause streets to be opened and laid out through the same.

That the city and county of San Francisco, since 1856, has been a municipal corporation, and one of the agencies of the state for local government, and that its officers, in all matters pertaining to streets and the matters above set forth, derive their authority from, and proceed under what is known as, the "Street Law," hereinbefore mentioned, and certain acts amendatory thereof [which the bill enumerates], and that by section 14, art. 1, of the constitution of the state, it is provided that "private property shall not be taken or damaged for public use without just compensation having first been made to or paid into court for the owner," and that the acts set forth constitute a taking as well as damaging plaintiff's property for an alleged public use.

That no kind of legal proceedings by or against anybody has ever been instituted for the purpose of opening or laying out said basin as a public

street or streets, or to condemn or acquire any of the property rights of your orator, and no compensation has been provided for, paid, or tendered; and the property is intended to be taken without due process of law, which is in· violation of the constitution of the United States, upon which plaintiff relies; and "that the said defendants, and each of them, deny that said provisions of the· constitution of the United States afford to your orator any protection whatever."

That the defendants claim and pretend that the whole of said basin is private property, over which the board of supervisors has jurisdiction, and the claims of defendants as to the manner in which Fair and others acquired the title are as· follows, to wit: In the year 1864 the legislature of the state· authorized the sale to the North San Francisco Homestead & Railway Association of certain overflowed lands in the city and county of San Francisco. The act was· approved April 4, 1864 (pages 482–483, St. 1863–64). That it was provided by said act that the commissioners of swamp and overflowed lands should appraise certain lands covered by the waters of the bay, extending to· a depth not exceeding six feet at lowest stage of the tide, and that upon the· payment by said association of the sum appraised a patent from the state should· issue to said· association. And it was expressly provided in said act that in no case should the water front of the adjoining property be interfered with, and that said association, nor its employés, agents, successors, or assigns, should have a right·to levy or collect any tolls, dockages, or· wharfages, and that the said association or·its assigns shall not have the power to make any use of said lands, or any part thereof, which shall interfere· with the navigation of the Bay of San Francisco. And defendants further claim that a patent was duly issued, and recorded in the recorder's office of the city and county· of San Francisco, and that Fair and other private persons succeeded to the interest of said association. And plaintiff avers that the interest which it is claimed said association derived as aforesaid consists of all of said basin which lies south of a pretended street called "Tonquin Street," which is south of Lewis street, and runs across said basin parallel with Lewis street, and the basin, between the shore and said Tonquin street, is immediately in front of plaintiff's said property. And plaintiff avers that the greater portion of the soil of the basin, which defendants claim was acquired under said act of 1864, extends far beyond the·depth of six feet of water at lowest stage of the tide, and for that reason, if no other, said conveyances under said act were invalid, and that the only title which said persons have is derived through the said association. And plaintiff alleges that neither at the time of the passage of the act, nor the issuance of the said conveyances to said association, was any water-front line established or existing for any part of the city and county of San Francisco, which fronts on said basin, or has ever existed or now exists, and that said act is void for many reasons, viz.: It was and is in contravention of the act of congress admitting the state into the Union. It is in violation of the trust upon which the state held the land covered by navigable waters. That the subject of the act is not expressed in its title. It contains no definite description of the quantity of land, but attempts to delegate the determination to the discretion of the officers who are to appraise the land, and it contains no designation of the character of the land, and, being void, the proceedings under it were void; and the conveyances were void for the additional reason that no water-front line existed or exists, and that none of the land was authorized to be conveyed. And plaintiff further·avers, if title did pass, it is held in the same trusts as the state of California held it, and that none of the defendants, nor said other persons, ever had or has, under said act of 1864 or otherwise, any right to destroy or obstruct the navigability of said basin.

And plaintiff avers, on information and belief, that the portion of the basin which lies north of Tonquin street, and between the same and the northern line of Lewis street, the defendants claim, is the private property of Fair and a few others, and that the board of supervisors has jurisdiction thereof under the street law, and that its pretended title is as follows: In the year 1868 the legislature of the state of California passed an act entitled "An act to survey and dispose of certain salt marsh and tide lands belonging to the state of California," approved on March 30, 1868, which act is published in the

Laws of 1867–68, at pages 716 to 722, inclusive, to which act reference is hereby made. That in and by the said act it was provided that a board of tide-land commissioners should be appointed in the manner pointed out in the said act, and that it was by said act further provided that the said "commissioners shall take possession of all the salt marsh and tide lands, and lands lying under water, to the point that may be established as the water front, situate along the Bay of San Francisco, and situate in the city and county of San Francisco, belonging to the state of California, and have the same surveyed to a point not beyond twenty-four feet water at the lowest stage of the tide, and cause to be prepared two maps of the same, showing the quantity and extent of the property situated as aforesaid;" and that said tide-land commissioners, in conjunction with the governor of California, the mayor of San Francisco, and the president of the Chamber of Commerce of San Francisco, should meet, and, by a two-thirds vote, establish the waterfront line of San Francisco, where it had not been previously established by the act of March 26, 1851, and that after the establishment of such waterfront line, and after compliance with the provisions of section 4 of said act, said commissioners should proceed to sell at public auction, to the highest bidder, all the right, title, and interest of said state of California in and to the lands of which they were to take possession as hereinabove stated, as the whole will more fully appear from the provisions of said last-mentioned act, to which reference is hereby made. And your orator avers and charges that the defendants claim and pretend that the said act is a valid act of the legislature, and that under and in pursuance of its provisions the said tide-land commissioners did take possession of said lands lying under water, to a depth not exceeding twenty-four feet of water at the lowest stage of the tide, and that said commissioners did cause the same to be surveyed, and that said commissioners afterwards, in conjunction with the governor of the state and the mayor of San Francisco, and the president of the Chamber of Commerce, met together, and, by a two-thirds vote, established the water-front line of said San Francisco. But your orator avers and charges that said act of March 30, 1868, was and is invalid and void and of no effect, for the following, among other, reasons, viz.: It was and is in contravention of the said act of congress of September 9, 1850, admitting the state of California into the Union; it is in violation of the trust upon which the state of California held all the land covered by navigable waters, as hereinabove set forth; it attempts to delegate to others the power to establish a water-front line for the city of San Francisco, such power not being subject to any confirmation or power of rejection by the legislature itself, and to give to such others the power of sale of all lands up to such undefined line; it attempts to deprive the owners along the shore of their rights of access to their property, without any compensation made or to be made, and without due process of law; and finally for the reason that neither the subject nor the object of the act is expressed in its title. And your orator avers that, inasmuch as the act itself was and is void, whatever proceedings were had under it were and are equally void.

And plaintiff avers that defendants claim that conveyances were made, under the provisions of said act of 1868, to said North San Francisco Homestead & Railway Association, but that the conveyances are void for the additional reasons that the commission did not take possession of the lands, nor cause them to be surveyed, and the water-front line never was established; that the act of the legislature of 1870 (St. 1869–70, pp. 541, 542) abolished the said board of commissioners, and created a new board, and defined the lands to be, over which it has jurisdiction, as "all the salt marsh and tide lands lying under water belonging to the state of California and situate in the city and county of San Francisco," and that these lands are not of the same character as the lands described in the act of 1868, and that no conveyances of any of said lands north of Tonquin street were made to said association, or to any one, prior to the time said act of 1870 took effect, and all the conveyances were and are void; that by section 365 of the Political Code, which took effect 1st of January, 1873, it was provided that the "governor, surveyor general, and controller, constitute the state board of tide-land commissioners," and by section 998 of same Code the powers and duties of

the tide-land commissioners are provided by the act of 1868 and 1870 afore-said, but that there was the same defect in section 698 as in the act of 1868, and no greater virtue in section 698 than in the act of 1870; that by an act approved March 30, 1874 (St. 1873-74, p. 858), the act of 1868 was repealed in toto, and the act of 1870 repealed so far as it provided for a board of tide-land commissioners, and that the state board of tide-land commissioners was invested with all the powers and duties vested by the act of 1870 in the board of tide-land commissioners, and that the act of 1874 and said sections of the Political Code were repealed by an act approved February 4, 1876, and that no conveyance of the land north of Tonquin street was made prior to the said act of 1874, and that all conveyances thereof are void, and, if any title vested, it was subject to the same trusts upon which the lands were held by the state; that by an amendment to section 2532 of the Political Code made by the legislature of 1876 the board of state harbor commissioners were authorized to survey, and, in connection with certain officers, locate, a new harbor front and sea-wall line for the city of San Francisco, and that the said harbor commissioners, in conjunction with said officers, did locate a new line which extended across the mouth of said basin and up to what is known as the "Presidio Reservation," but that the legislature (St. 1877-78, p. 263) confirmed only so much thereof as extended easterly from Taylor street to the boundary of San Mateo county, and annulled that portion which extended across the said basin as aforesaid; and that there never has been any water-front line extending across said basin. And plaintiff avers defendants claim that said act of the legislature impairs the obligation of a contract or contracts to the pretended conveyances aforesaid, and that said act of 1878 and said amendment of the Political Code are in violation of the constitution of the United States, and are void, and that plaintiff relies on said act and amendment, and claims that neither impairs the obligation of any contract, and that neither is in conflict with any provision of the constitution, and is not void.

And plaintiff further avers that the constitution of the state of California adopted May 7, 1879, contains the following provisions (article 15):

"Sec. 2. No individual, partnership or corporation, claiming or possessing the frontage or tidal lands of a harbor bay, inlet, estuary, or other navigable water in this state, shall be permitted to exclude the right to such water, whenever it is required for any public purpose, nor to destroy or obstruct the free navigation of such water; and the legislature shall enact such laws as will give the most liberal construction to this provision, so that access to the navigable waters of this state shall be always attainable for the people thereof.

"Sec. 3. All tide lands within two miles of any incorporated city or town in this state and fronting on the waters of any harbor, estuary, bay or inlet, used for the purpose of navigation, shall be withheld from grant or sale to private persons, partnerships, or corporations."

And avers that, if any title vested in said association or private persons, it was annulled by said provisions. And defendants claim that they impair the obligation of the conveyances aforesaid, and are in violation of the provisions of the constitution of the United States, in violation of the power of the state to impair the obligation of a contract, and deprive said private persons of their property without due process of law. But plaintiff relies on said provision of the constitution of the state.

That by an act of congress passed August 11, 1888 (25 Stat. 400-425), it was enacted as follows:

"Sec. 12. Where it is made manifest to the secretary of war that the establishment of harbor lines is essential to the preservation and protection of harbors, he may and is hereby authorized to cause such lines to be established beyond which no piers or wharves shall be extended or deposits made, except under such regulations as may be prescribed from time to time by him."

That in pursuance of said section the secretary of war ran a line through said basin, outside of Lewis street, on the 24th of March, 1890; and defendants claim and pretend that said line and act authorize the filling in of so much of said bay which lies south of said line. But plaintiff controverts

the claim, and claims, besides, it is void because it is the result of a declaration of power to an executive officer.

Plaintiff avers that no part of said basin is private property, and that the board of supervisors has no jurisdiction; that defendants are conspiring to injure, and will injure, plaintiff, by the acts aforesaid, and that they will constitute a taking as well as a damaging, and in violation of the provisions of the constitution of the United States, and are contrary to equity and good conscience, and the act admitting California into the Union; that plaintiff's estate is of the value of $10,000 and upwards, and that said value will be more than one-half destroyed by the acts aforesaid; and that the right of access to said navigable waters for the remainder of the term is worth upwards of $5,000, and plaintiff will therefore suffer damages in a sum exceeding $15,000.

The prayer is in accordance with the allegations.

Upon filing the bill an order restraining defendants was made, and plaintiff moves that it be continued. Upon this motion the defendants have filed affidavits denying many of the allegations of the bill, and also object to the jurisdiction of the court.

The plaintiff relies on three grounds of jurisdiction:

(1) That their property will be cut off from access to navigable waters by the proposed work, and therefore taken without due process of law.

(2) The act of admission of the state of California, which provides:

"All the navigable waters within said state shall be common highways and forever free, as well to the inhabitants of said state as to the citizens of the United States, without any tax, impost or duty therefor."

(3) That defendants claim that certain acts of the legislature and of congress, which plaintiff relies on, including the second and third sections of article 15 of the constitution of the state of California, and the action of the secretary of war in fixing a harbor line, impair the obligation of contracts, and hence are a violation of the constitution of the United States.

The two latter grounds may be easily disposed of. The second ground, though having prominence in both the original and amended bills, has not been urged in argument. It is clearly untenable, under the decision of the supreme court in Bridge Co. v. Hatch, 125 U. S. 1, 8 Sup. Ct. 811. In the decision, a clause in the act admitting Oregon into the Union, similar to the clause in the act admitting California, was considered; and it was held that it did not refer to physical obstructions of navigable waters, but to political regulations which would hamper the freedom of commerce. See, also, Cardwell v. Bridge Co., 113 U. S. 205, 5 Sup. Ct. 423, and Monongahela Nav. Co. v. U. S., 148 U. S. 312, 13 Sup. Ct. 622.

The third ground is also disposed of by the case of Tennessee v. Union & Planters' Bank, 152 U. S. 454, 14 Sup. Ct. 654. Justice Gray, speaking for the court, reviewed three cases, two of which were originally brought in the circuit court of the United States, and one was removed to such court from one of the state courts of Tennessee. All of them were brought to recover taxes alleged to be due to the state and county for the years 1887–91. The charters of the defendant banks provided "that said company shall pay to the state of Tennessee an annual tax of one-half of one per cent. on each share of stock subscribed, which shall be in lieu of all taxes." The bill in

the two cases brought in the circuit court set out the provision of
the charters, and the general tax act of the state, and alleged that
the defendants claimed, by virtue of the terms of the charter, the tax
act was void, because in violation of the clause of the constitution
of the United States which forbids the state to pass any law impair-
ing the obligation of a contract. In the removal case these allega-
tions were contained in the defendant Banks' petition for removal.
In the first two cases the bills were ordered dismissed, and the third
case was remanded to the state court. The court held that "under
the act of Aug. 13, 1888, c. 866, the circuit court of the United States
has no jurisdiction, either original or by removal from a state court,
of a suit, as one arising under the constitution, laws, or treaties of
the United States, unless that appears by the plaintiff's statement
of his own claim." It will be observed that the case at bar, like
the two cases passed on, is an original suit in the circuit court, and
the plaintiff's allegations of defendants' claims and pretensions are
like the allegation of plaintiffs in those cases of the claims and pre-
tensions of the defendants therein. The cases seem identical with
the case at bar, but counsel claims a distinction, inasmuch as the acts
of the legislature which, it is averred in the case at bar, defendants
rely on, are general ones, and necessarily arise, whether set up by
the defendants or not, while the bank charters in the main cases
were necessary to be averred and proved, and cites Illinois v. Illinois
Cent. Ry. Co., 33 Fed. 726. Counsel say on page 22 of their reply
brief, and I quote at length, so as to give a full statement of the con-
tention:

"The last proposition of the learned counsel relates to our claim of juris-
diction founded upon the claims and pretenses of defendants. And they cite,
as conclusive, the case of Tennessee v. Union & Planters' Bank, 152 U. S.
454, 14 Sup. Ct. 654. We think that the learned counsel are mistaken in
their view of that case. The principle which it lays down is this: That
federal jurisdiction cannot arise from a defense which the defendant may
or may not set up. That principle is undoubtedly correct in the abstract,
and also as applied to the facts of the particular case, which rested upon
the charter of the bank, which was a private matter, and could not arise in
the case unless set up by the defendant. Manifestly, the principle does not
apply to a general act of the legislature, of which the court takes notice, and
which necessarily arises, whether set up by the defendant or not. We do
not want any better illustration of the distinction than is afforded by the
decision of Mr. Justice Harlan in the Chicago Water-Front Case, 33 Fed.
726. That case was commenced by the state of Illinois in one of her own
courts. It was removed to the federal court, on petition of the defendant,
under the act of 1887. The federal jurisdiction depended upon the validity
of a repealing act, which it was claimed would be drawn in question. It
was denied that it would be set up; but the court held that the question of
the validity of the act necessarily arose whether it was relied on or not, and
that, therefore, the court had jurisdiction. And Mr. Justice Harlan said:
'It is quite sufficient upon this point to say that the court is bound to take
judicial notice of that statute, and must give effect to it, unless at the hear-
ing it be adjudged to be unconstitutional and void. The disclaimer of the
attorney general cannot work a repeal of the act of 1873, nor close the eye
of the court to the fact that the state—if it could be constitutionally done—
has repealed the act of 1869. * * * Even if the attorney general had stip-
ulated with the company that he would not, in this proceeding, claim any-
thing for the state under the latter act, the court would feel obliged to
disregard such stipulation. Whether the repealing act had such effect is a

question which the company proposes to raise at the proper time, and in proper form for judicial determination. Upon that question mainly depends the result of this litigation. The presence in the cause of such an issue makes this a case arising under the constitution of the United States.'" Illinois v. Illinois Cent. Ry. Co., 33 Fed. 726.

It is not very clear why a defense which may depend on the notice which the court may or must take should have a different jurisdictional effect from a defense which can be proved by a defendant; but I am not called upon to reconcile Justice Harlan's views, as quoted, with the views of the supreme court. They are not antagonistic. He concurred in the opinion of the court dismissing the bill in the first two cases passed on, and to which we have seen the case at bar is similar; that is, the two cases which were brought in the circuit court. The views he expressed in Illinois v. Illinois Cent. Ry. Co. were of the third case, to wit, one brought in a state court, and removed on petition of defendant on the ground that the defense depended upon, or would be defeated by, one or other construction of the constitution. To give the circuit court original jurisdiction, therefore, it is necessary that the plaintiff's statement of his cause of action show that he relies on some right under the constitution or laws of the United States; and it follows that the third ground of jurisdiction relied on by plaintiff, to wit, the claims and pretenses of defendants, is not sufficient.

This leaves for consideration the first ground of jurisdiction claimed.

Chief Justice Waite, speaking for the court in Starin v. City of New York, 115 U. S. 248, 6 Sup. Ct. 28, said:

"The character of a case is determined by the questions involved. Osborn v. Bank, 9 Wheat. 738, 824. If, from the questions, it appears that some title, right, privilege, or immunity on which the recovery depends will be defeated by one construction of the constitution or a law of the United States, or sustained by the opposite construction, the case will be one 'arising under the constitution or laws of the United States,' within the meaning of that term as used in the act of 1875; otherwise, not. Such is the effect of the decisions on this subject. Cohens v. Virginia, 6 Wheat. 264, 379; Osborn v. Bank, 9 Wheat. 738, 824; Mayor, etc., v. Cooper, 6 Wall. 247, 252; Water Co. v. Keyes, 96 U. S. 199, 201; Tennessee v. Davis, 100 U. S. 257, 264; Railroad Co. v. Mississippi, 102 U. S. 135, 140; Ames v. Kansas, 111 U. S. 449, 462, 4 Sup. Ct. 437; Kansas Pac. R. Co. v. Atchison, T. &. S. F. R. Co., 112 U. S. 414, 416, 5 Sup. Ct. 208; Society v. Ford, 114 U. S. 635, 641, 5 Sup. Ct. 1104; Pacific Railroad Removal Cases, 115 U. S. 1, 11, 5 Sup. Ct. 1113."

The questions involved are the right of the plaintiff as riparian proprietor; the character and legality of the acts of board of supervisors, as infringing that provision of the fourteenth amendment of the constitution of the United States which prohibits a state from depriving a person of property without due process of law. The bill alleges that the board of supervisors is claiming to proceed under the street law, but the street law only authorizes the board to proceed if Lewis street is open or dedicated to public use,—not to take any one's property, but to improve property already acquired. Spaulding v. Bradley, 79 Cal. 449, 22 Pac. 47; Spaulding v. Wesson, 84 Cal. 142, 24 Pac. 377; Cook v. Sudden, 94 Cal. 443, 29 Pac. 949.

The defendants claim the dedication or grant of the street by the legislature of the state, exercising its sovereignty over and ownership of tide lands. If the legislature have such power, the plaintiff has no riparian rights,—in other words, none of its property was taken, —and the case of Kaukauna Water-Power Co. v. Green Bay & M. Canal Co., 142 U. S. 269, 12 Sup. Ct. 173, applies. In that case the court said (Justice Brewer delivering the opinion):

"The only question involved in this case, proper for us to consider, is whether the act of the legislature of Wisconsin of August 8, 1848, reserving to the state the water power created by the erection of the dam over the Fox river, as construed by the supreme court of the state, and the proceedings thereunder, operated to deprive the plaintiffs in error of their property without due process of law. Notwithstanding the inhibition of the constitution is not distinctly put in issue by the pleadings, nor directly passed. upon in the opinion of the court, it is evident that the court could not have reached a conclusion adverse to the defendant company without holding, either that none of the property had been taken, or that it was not entitled to compensation therefor, which is equivalent to saying that it had not been deprived of its property without due process of law."

The defendants, however, urge that the fourteenth amendment is only directed against state action by the legislature, or, if it is prohibitive of executive acts, only of authorized executive acts, and that in the case at bar there is no act of the legislature under which plaintiff's property is sought to be taken, and that if Lewis street is not open, or has not been dedicated, the board of supervisors is proceeding without authority, and its acts cannot be attributable to the state. Both contentions appear to be opposed to Ex parte Virginia, 100 U. S. 346. In this case, Justice Strong, rendering the opinion of the majority of the court, said:

"They [meaning the provisions of the amendment] have reference to the actions of the political body denominated a 'state,' by whatever instruments or in whatever modes that action may be taken. A state acts by its legislative, its executive, or its judicial authorities. It can act in no other way. The constitutional provision, therefore, must mean that no agency of the state, or of the officers or agents by whom its powers are exerted, shall deny to any person within its jurisdiction the equal protection of the laws. Whoever, by virtue of public position under a state government, deprives another of property, life, or liberty without due process of law, or denies or takes away the equal protection of the laws, violates the constitutional inhibition; and as he acts in the name and for the state, and is clothed with the state's power, his act is that of the state. This must be so, or the constitutional prohibition has no meaning. Then the state has clothed one of its agents with power to annul or evade it."

In Virginia v. Rives, 100 U. S. 313–338, the same learned justice said (page 318):

"The provisions of the fourteenth amendment of the constitution we have quoted, all have reference to state action exclusively, and not to any action of private individuals. * * * It is doubtless true that a state may act through different agencies,—either by its legislative, its executive, or its judicial authorities,—and the prohibition of the amendment extends to all action of the state denying equal protection of the laws, whether it be by action by one of these agencies or by another."

This language is made unmistakable by the dissenting opinion of Justices Field and Clifford.

There was a series of cases involving the rights of the colored race, all of which were based on the same reasoning by the court and by those learned justices. In Virginia v. Rives and Ex parte Virginia, the action was by judicial officers unauthorized by a state statute. The instance under consideration was the omission to put colored citizens on the jury list. The state statute made no discrimination. Justices Field and Clifford therefore contended, among other things,—but unavailingly contended,—that the action of the officers was not the action of the state. Justice Field said in Virginia v. Rives (page 333), referring to the fourteenth amendment:

"Its language is that 'no state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty or property without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws.' As the state, in the administration of its government, acts through its executive, legislative, and judicial departments, the inhibition applies to them. But the executive and judicial departments only construe and enforce the laws of the state. The inhibition, therefore, is, in effect, against the passing and enforcing any laws which are designed to accomplish the ends forbidden. If an executive or judicial officer exercises power with which he is not invested by law, and does unauthorized acts, the state is not responsible for them. The action of the judicial officer in such a case, where the rights of a citizen under the laws of the United States are disregarded, may be reviewed and corrected or reversed by this court. It cannot be imputed to the state, so as to make it evidence that she, in her sovereign or legislative capacity, denies the rights invaded, or refuses to allow their enforcement. It is merely the ordinary case of an erroneous ruling of an inferior tribunal. Nor can the unauthorized action of an executive officer, imposing upon the rights of the citizen, be taken as evidence of her intention or policy, so as to charge upon her a denial of such rights."

This court, therefore, has jurisdiction, and it will be necessary to consider the other issues.

A consideration of these has been, since the oral argument, simplified by the decision of the supreme court in Shively v. Bowlby, 152 U. S. 1, 14 Sup. Ct. 548. Mr. Justice Gray, speaking for the court, after reviewing all the cases, laid down, among others, the following proposition:

"The title and rights of riparian or littoral proprietors in the soil below high-water mark are governed by the laws of the several states, subject to the rights granted to the United States by the constitution."

The power of the state could not be more strongly emphasized than by that case. Shiveley was the owner of the upland. Bowlby was the grantee of the state of Oregon of the tide lands in front of Shiveley's property, and the grant was sustained; the court holding, following the law of Oregon, "that the state had a right to dispose of its tide lands free from any easement of the upland owner." Our inquiry, therefore, must be, what is the law of California? For whether the plaintiff has the right contended for depends on that law.

It is part of the history of the state that the legislature, commencing at the first session after the admission of the state into the Union, made grants of the tide lands to municipalities under conditions which contemplated their being conveyed to and held in pri-

vate ownership. Among these was the act of March 26, 1851, known as the "Beach and Water Lot Act." It was entitled "An act to provide for the disposition of certain property of the state of California." Section 1 provided that "all the lots of land situated within the following boundaries according to the survey of the city of San Francisco and the map or plat of the same now on record in the office of recorder of the county of San Francisco are known and designated in this act as the S. F. Beach and Water Lots; that is to say, beginning at the point," etc. Then follows a description by streets, which includes a portion of the bay. Section 2 grants the use and occupation of the land for 99 years, and confirms grants of lands sold by authority of the ayuntamiento, or town or city council, or by any alcalde of said town or city; and section 4 makes the boundary line described in the first section a permanent water front of the city. These acts came up for consideration, and the character of the title conveyed was defined, in Smith v. Morse, 2 Cal. 524; Eldridge v. Cowell, 4 Cal. 87; Chapin v. Bourne, 8 Cal. 294; Hyman v. Read, 13 Cal. 445; Holladay v. Frisbie, 15 Cal. 635; Wheeler v. Miller, 16 Cal. 125; and City and County of San Francisco v. Straut, 84 Cal. 124, 24 Pac. 814. The cases are undoubtedly familiar, but the importance of the present action will justify their review.

In Smith v. Morse, a sale of a water lot for a debt of the city was sanctioned.

In Eldridge v. Cowell, the complaint alleged that the plaintiff was the owner of the 50-vara lot known on the map of San Francisco as "1,492;" that the defendant was obstructing the navigation to the lot by mooring and anchoring storeships and making embankments in front of it, and prayed for an injunction and abatement of the nuisance. Justice Hydenfelt delivered the opinion of the court, Chief Justice Murray concurring. The opinion is short, and, besides, its importance induces me to quote it at length:

"In the plan of the city of San Francisco, the survey into blocks, lots, and streets extended into the tide waters in front of the city, the object of which was to reach a sufficient depth of water on the land line for the convenience of shipping. It was necessarily anticipated that the water lots would be filled up to a level suitable for building or land carriage. That this was perfectly legitimate, in the establishment of a seaport town, is so self-evident that it needs no argument to prove it. The plaintiff obtained by purchase his lot, with a full knowledge of the plan of the city. The right of the owners of water lots to fill them up with earth, for the purpose of improvement and use, was practically admitted by him in filling up that part of his own lot, and the street in front of it, which was in the water. It is not material to inquire as to the first authority for the plan of the city, as extended into the water. It is sufficient that by the act of 26th of March, 1851, this plan was recognized by the state, and property in the lots covered by tide water vested in individuals. The right of the state to do this has been established by repeated decisions. She holds the complete sovereignty over her navigable bays and rivers; and although her ownership is, by the law of nations and the common and civil law, attributed to her for the purpose of preserving the public easement, or right of navigation, there is nothing to prevent the exercise of her power, in certain cases, to destroy the easement, in order to subserve the general good, which, when done, subjects the land to private proprietorship. The lot of the defendant was thus permitted, by state legislation, to be reclaimed from the water, and this was so before the plaintiff acquired

his lot. He therefore took without any riparian rights. The destruction of the easement in front of him had already been decreed by competent authority. But it is said that the filling up by the defendant is a nuisance, because it will destroy or impair the navigation of the bay. Assuming this to be true, the plaintiff, as I have shown, has no right to complain; and, in regard to the public, it is not one of those acts which would be denominated or classed as a nuisance. It is, at most, a purpresture, and as such, if destructive to navigation, or seriously affecting the public welfare, would subject the defendant to a prosecution by the people: certainly, not to an action by this plaintiff. Many of the positions taken by the plaintiff in the instructions asked are doubtless sound, and, applied in reference to the whole of this case, they are mere abstract propositions, and were properly refused."

In Chapin v. Bourne the action was ejectment to recover a lot within the line of the beach and water lot property. The plaintiff relied upon a grant from an alcalde of San Francisco. The defendant relied upon a deed from the board of land commissioners, made in pursuance of the act of May, 1853. The title of this act is, "To provide for the sale of the interest of the state of California in the property within the water line front of the city of San Francisco, as described in and by the act entitled 'An act to provide for the disposition of certain property of the state of California,' passed March 26, 1851." The court held (Terry, C. J., delivering the opinion) that neither party had title,—not the plaintiff, because: First. When the alcalde made the grant the pueblo of San Francisco had no title whatever to the water property. It belonged to the United States, who held it in trust for any new state that might be erected out of said territory, and passed to the state of California, on her admission, by virtue of her sovereignty, and that it did not pass under the act of March 26, 1851, because the grant was not recorded as required by said act. Second. The defendant had no title, because the title had passed to the city by the act of March 26, 1851, and that the commissioners had no power to sell any other than the reversionary interests of the state.

In Hyman v. Read the action was also ejectment, and the plaintiff and defendant, respectively, claimed under a purchase from the state land commissioners under the act of 1853, and from the city under the act of 1851. Both acts were an exercise, or attempt to exercise, by the legislature, of a power to vest the property in private ownership. The significance of the decision, as compared with prior ones, is that the property involved was a lot in the city slip. The contention of the defendant was that the act of 1851 conveyed only "lots," technically so called. The court held, however (Terry, C. J., rendering the opinion; Justice Field concurring), that all the land embraced in the general boundaries was conveyed to the city.

In Holladay v. Frisbie the court, by Chief Justice Field, said:

"The interest of the city in the beach and water lot property is a legal estate for ninety-nine years. The property is not devoted by the grant of the state to any specific public purpose, or made subject to the performance of any trusts by the city. It is held by a very different tenure, by which the city holds the land of the old pueblo, and which was the subject of elaborate consideration in Hart v. Burnett, 15 Cal. 530. These lands were given upon express trusts, and are now held, if not upon precisely the same trusts, yet upon trusts equally effectual to protect them from forced sale under execution. As to the beach and water lot property, the case is different. In that property

the interest of the city is absolute, qualified by no conditions, and subject to no specific uses. It is therefore a leviable interest, subject to sale under execution, and such interest in the premises in controversy passed to the defendant upon the sale and conveyance under his judgment and execution."

In this case the power of the legislature was illustrated by a confirmation of the Van Ness ordinance. Of this the court said:

"But, independent of all consideration of the title derived from the sale and conveyance of the sheriff, the defendant can successfully resist a recovery by the plaintiff by force of the title vested in him under the Van Ness ordinance. * * * Whatever question may be raised as to the liability of his interest to forced sale, there can be none as to the validity and effect of his voluntary grant of the same, after such grant has received the approval and satisfaction of the legislature."

In Wheeler v. Miller, Holladay v. Frisbie was affirmed as to the estate of the city under act of 1851. It was again affirmed in City and County of San Francisco v. Straut. The action was ejectment for the recovery of one of the beach and water lots. The defense was adverse possession. The court held that:

"The interest of the city and county of San Francisco in its beach and water lot property is a legal estate for 99 years; and the right of the city for that term is as absolute a title, and as free from trust, as that of any private proprietor, and may be extinguished by adverse possession under the statute of limitations."

The court further quoted, in support of these propositions, San Francisco v. Calderwood, 31 Cal. 585; Hoadley v. San Francisco, 50 Cal. 274, 275,—and referred to Yolo Co. v. Barney, 79 Cal. 378, 21 Pac. 833.

In Taylor v. Underhill, 40 Cal. 473, Justice Temple said, speaking of lands below high-water mark:

"This state can probably sell the land, and authorize the purchaser to extend the water front so as to enable him to build upon this land. * * *"

These decisions cover a period of 40 years, and have become a rule of property, and the foundation of many titles. They do not seem to be careless decisions, and, therefore, that consideration was given to the relations of the state to navigable waters, and to all other elements for a correct judgment, it is natural to suppose; and it seems an irresistible inference that if the legislature had the power to pass the act of 1851, conveying to the city, with the power to sell, land covered by navigable waters, subjecting them to private ownership and reclamation, or to public use, it would have like power over the lands covered by navigable waters in front of plaintiff's property. Plaintiff's counsel, however, deny the right with firmness, and support the denial with ability. They contend that the state had no power to dispose of lands covered by navigable waters to the city, or to any one else, and cite People v. Gold Run Ditch & Min. Co., 66 Cal. 151, 152, 4 Pac. 1152; Heckman v. Swett, 99 Cal. 303, 33 Pac. 1099; Chicago Water-Front Case, 146 U. S. 453, 13 Sup. Ct. 110. Counsel say, "Now, this being the case.[i. e. the title to the land, and not merely the supervision of a use, being in the state], it has no power to convey it away for a purpose not connected with the purpose of the trust;" citing Hoadley v. San Francisco, 50 Cal. 275,

276; San Francisco v. Itsell, 80 Cal. 57, 22 Pac. 74; Hoadley's Adm'rs
v. San Francisco, 124 U. S. 646, 8 Sup. Ct. 659. It may be admitted
as incontestable, if the title is held in trust, as in the cases cited, the
state has no right to convey it away, divested of the trust; but, if
this is true of the land now in controversy, it was true of the lands
described in the act of 1851. But this act was sustained, as we have
seen, by a number of cases, and in Holladay v. Frisbie and in City
and County of San Francisco v. Straut, the interest of the city in the
water lots was carefully distinguished from the interest of the city
in pueblo property, which was the subject of the decisions in Hoad-
ley's Adm'rs v. San Francisco and San Francisco v. Itsell, supra. It
it worthy of note that Justice Field delivered the opinion of the court
in Hart v. Burnett, which established the principle which applies
to pueblo land, and delivered also the opinion in Holladay v. Frisbie,
which establishes the distinction between them and the beach and
water lots. The relation of these cases, therefore, or rather the dis-
tinction between them, must have been firm and clear in his mind,
and in the mind of the court.

In People v. Gold Run Ditch & Min. Co., supra, Justice McKee,
in rendering the opinion of the court, said:

"As we have already said, the rights of the people in the navigable rivers
of the state are paramount and controlling. The state holds the absolute
right to all navigable waters, and the soils under them, subject, of course,
to any rights in them which may have been surrendered to the general govern-
ment. Martin v. Waddell, 16 Pet. 367. The soil she holds as trustee of a pub-
lic trust for the benefit of the people, and she may, by her legislature, grant
it to an individual; but she cannot grant the rights of the people to the use
of the navigable waters flowing over it. These are inalienable. Any grant
of the soil, therefore, would be subject to the paramount rights of the people
to the use of the highway. And such was the doctrine of the common law.
'The jus privatum,' says Lord Hale in De Jure Maris (page 22), 'must not
prejudice the jus publicum, wherewith public rivers and arms of the sea are
affected to public use.' It is therefore beyond the power of legislatures to
destroy or abridge such rights, or to authorize their impairment."

But there is no inconsistency between this case and the cases
which preceded. No inconsistency was deemed to exist by the
supreme court of the state, for that court, in City and County of San
Francisco v. Straut, rendered afterwards, affirmed the prior cases.
Nor can it be said it was intended to reverse People v. Gold Run
Ditch & Min. Co. The language of the latter case, even if it be held
as necessary to the judgment of the court, is but a general expression
of a proposition uttered in a number of cases. The proper limita-
tion of the language is expressed by the supreme court in Shively
v. Bowlby, supra, or shown by the cases themselves. A limitation
is expressed in quite general language in Heckman v. Swett, 99 Cal.
309, 310, 33 Pac. 1099,—a case cited by complainant. The court
said:

"Navigable streams, and the shores to ordinary high-water mark, are held
by the state in trust for the public; *but qualified rights therein may be granted, so
far as they are not inconsistent with, or are in aid of, the principal use, viz. for the
purposes of navigation.*" (The italics are mine.)

What this qualification means is explained by the practice of the
states of the Union and the decisions of the courts. Hardin v.

Jordan, 140 U. S. 371, 11 Sup. Ct. 808, 838, may be selected for illustration. Justice Bradley, speaking for the court, after stating that the title to shore and lands under water is regarded as incidental to the sovereignty of the state,—a portion of the royalties belonging thereto, and held in trust for the public purposes of navigation and fishing (language which, it may be remarked in passing, is similar to Justice McKee's in People v. Gold Run Ditch & Min. Co.),—said:

"Such title being in the state, the lands are subject to state regulation and control, under the condition, however, of not interfering with the regulations which may be made by congress with regard to public navigation and commerce. The state may even dispose of the usufruct of such lands, as is frequently done by leasing oyster beds in them, and granting fisheries in particular localities; also, by the reclamation of submerged flats, and the erection of wharves and piers, and other adventitious aids of commerce. Sometimes large areas so reclaimed are occupied by cities, and are put to other public or private uses; state control and ownership therein being supreme, subject only to the paramount authority of congress in making regulations of commerce, and in subjecting the lands to the necessities and uses of commerce. See Manchester v. Massachusetts, 139 U. S. 240, 11 Sup. Ct. 559; Smith v. Maryland, 18 How. 71; McCready v. Virginia, 94 U. S. 391; Martin v. Waddell, 16 Pet. 367; Den v. Jersey Co., 15 How. 426."

Illinois Cent. R. Co. v. Illinois, 146 U. S. 387–464, 13 Sup. Ct. 110, is urged as supporting plaintiff's contention. That case, in its facts, is conspicuously different from the one at bar. The grant was not of portions of land within a harbor line established by public authority to assist commerce; but it was a grant of the whole harbor, conveying its control to a private corporation,—a virtual abdication of the power of the state, the court said, and hence either void or revocable. I refrain from an extended examination of this decision, because it will come under consideration in another case, where a careful analysis of it will be necessary. It is only necessary now to point out its distinction from the case at bar, and to state the principal it establishes. It is not that a state cannot dispose at all of lands covered by navigable waters, but that, to quote the language of Justice Field:

"It is the settled law of the country that the ownership of, and dominion and sovereignty over, lands covered by tide waters within the limits of the several states, belong to the respective states within which they are found, with the consequent right to use or dispose of any portion thereof, when that can be done without substantial impairment of the interest of the public in the waters, and subject always to the paramount right of congress to control their navigation so far as may be necessary for the regulation of commerce with foreign nations and among the states. This doctrine has often been announced by this court, and is not questioned by counsel of any of the parties. Pollard's Lessee v. Hagan, 3 How. 212; Weber v. Commissioners, 18 Wall. 57."

This principle is repeated in Shively v. Bowlby and manifestly does not exclude the grants relied on by defendants. The right of a state to deny riparian rights is clearly established by that case, and the cases it reviews. "Each state," Justice Gray said (page 26, 152 U. S., and page 548, 14 Sup. Ct.), "has dealt with the lands under tide waters within its borders according to its own views of public justice and policy, reserving its own control over such lands, or granting rights therein to individuals or corporations, whether own-

ers of the adjoining upland or not, as it considered for the best interests of the public."

It will be observed from the cases that this right is an attribute of a state's sovereignty and control of tide lands, and of the doctrine (probably dependent upon it) that grants of the upland stop at high-water mark.   These propositions are as firmly established in California as in other states, and the conclusion from them must be the same; that is, to quote Justice Gray's language in the Shiveley Case, "that the state has the right to dispose of its tide lands free from any easement of the upland owner."

In Packer v. Bird, 71 Cal. 134, 11 Pac. 873, the plaintiff claimed under a patent from the United States on a confirmed Mexican grant. The land was bounded by the Sacramento river, and the plaintiff therefore contended it extended to the middle of the stream.   The court said:

"We do not concur in this view.   The river being navigable in fact, the title extends no further than the edge of the stream.   We think this conclusion accords with the rulings in People v. Gold Run Ditch & Min. Co., 66 Cal. 138, 4 Pac. 1152, and Lux v. Haggin, 69 Cal. 255, 10 Pac. 674."

This case was taken by writ of error to the supreme court of the United States, and affirmed.   137 U. S. 661, 11 Sup. Ct. 210.   Justice Field, speaking for the court, said:

"In the courts of the western states there is much conflict of opinion,—some, like the courts of Illinois, adopting the common-law rule to its fullest extent; and others, like the courts of Iowa, repudiating its application, in determining the navigability of the great rivers, and the rights of riparian owners upon them.   A very elaborate consideration of the adjudged cases is found in McManus v. Carmichael, 3 Iowa, 1.   Indeed, the opinion of the supreme court of Iowa in that case, and the opinion of the court of appeals of New York in People v. Canal Appraisers [33 N. Y. 461, 499], above cited, contain an exhaustive and instructive consideration of the whole subject, with a careful review of the decisions of the courts of the states.   In this case we accept the view of the supreme court of California in its opinion, as expressing the law of that state,—'that the Sacramento river being navigable in fact, the title of the plaintiff extends no further than the edge of the stream.'   Lux v. Haggin, 69 Cal. 255, 10 Pac. 674."

This case was cited in Hardin v. Jordan, 140 U. S. 371-406, 11 Sup. Ct. 808, 838, as applying the principles expressed in Barney v. Keokuk, 94 U. S. 324, to California, in which it was held that the title of the riparian proprietor extends only to high-water mark, and that the city of Keokuk had a right to widen a street in front of the plaintiff's property below high-water mark, and authorize its occupation by railroad tracks and buildings, and that the riparian owner was not entitled to compensation.

In People v. Canal Appraisers, cited with approval in Packer v. Bird, it was decided that the Mohawk river is a navigable stream, and the title to its bed is in the people of the state of New York, and that the state had therefore the right to divert its waters without paying damages to riparian owners.

In Hoboken v. Railroad Co., 124 U. S. 656, 8 Sup. Ct. 643, the court held that, by the laws of New Jersey, lands below high-water mark on navigable waters are the absolute property of the state, subject only to the power conferred upon congress to regulate foreign com-

merce, and commerce among the states, and they may be granted by the state either to the riparian owners or to strangers, as the state sees fit, and that the right given to the Hoboken Company by the state, to improve the lands in front of streets terminating at the water, was valid, and not subject to the easement of the streets.

It is said that Weber v. Commissioners, 18 Wall. 57, decides that a riparian proprietor has a right of access to the navigable part of the stream. This was an appeal from the circuit court for the district of California, in which court one Weber filed a bill against the board of state harbor commissioners of California, to compel them to abate and to remove certain erections made by them on the water front of San Francisco, which he alleged interfered with a wharf rightfully erected by him. Weber derived title under act of 1853 to certain lots lying along the water front of the city, on which he had a wharf. The board of harbor commissioners proceeded, under acts of the legislature, to improve the harbor, and, in the execution of the work, caused piling to be had, and capping and planking on both sides of the complainant's wharf, so as to prevent the approach to it of vessels. Against any claim of the state the plaintiff also pleaded the statute of limitations. Mr. Justice Field delivered the opinion of the court, and said:

"It is unnecessary for the disposition of this case to question the doctrine that a riparian proprietor, whose land is bounded by a navigable stream, has the right of access to the navigable part of the stream in front of his land, and to construct a wharf or pier projecting into the stream, for his own use or the use of others, subject to such general rules and regulations as the legislature may prescribe for the protection of the public, as was held in Yates v. Milwaukee, 10 Wall. 497. On the contrary, we recognize the correctness of the doctrine, as stated and affirmed in that case."

But Yates v. Milwaukee has received a different explanation in Shively v. Bowlby, and is made to depend upon the law of Wisconsin. Besides, the learned justice seemed to intend to confine his language to land bounded by a stream, properly so called, as distinguished from the sea, or arm of the sea, for he further said:

"Nor is it necessary to controvert the proposition that in several of the states, by general legislation or immemorial usage, the proprietor whose land is bounded by the shore of the sea, or an arm of the sea, possesses a similar right to erect a wharf or pier in front of his land, extending into the waters to the point where they are navigable. In the absence of such legislation or usage, however, the common-law rule would govern the rights of the proprietor, at least in those states where the common law obtains. By that law the title to the shore of the sea, and of the arms of the sea, and in the soils under tide waters, is, in England, in the king, and, in this country, in the state. Any erection thereon without license is therefore deemed an encroachment upon the property of the sovereign, or, as it is termed in the language of the law, a 'purpresture,' which he may remove at pleasure, whether it tend to obstruct navigation or otherwise."

The learned justice then stated the title of the state to the soil under tide waters as follows:

"Upon the admission of California into the Union upon equal footing with the original states, absolute property in, and dominion and sovereignty over, all soils under the tide waters within her limits, passed to the state, with the consequent right to dispose of the title to any part of said soils in such manner as she might deem proper, subject only to the paramount right

of navigation over the waters, so far as such navigation might be required by the necessities of commerce with foreign nations or among the several states, the regulation of which was vested in the general government. Acting upon the rights thus acquired, the legislature of the state, on the 26th of March, 1851, at its first session after the admission, passed an act disposing of portions of the lands covered by the tide waters of the bay, in front of the city of San Francisco. That act is generally known to the state as the 'Beach and Water Lot Act.' "

The case, therefore, is authority that the act of 1851, as I have heretofore declared it to be, is a rightful exercise of the powers of the state; and it is adduced in Shively v. Bowlby as one of the later judgments of the supreme court, clearly establishing that the title and rights of riparian or littoral proprietors in the soil below high-water mark of navigable waters are governed by the local laws of the several states, subject to the rights granted to the United States by the constitution.

Shirley v. Bishop, 67 Cal. 545, 8 Pac. 82, does not militate against these views of the California laws. In that case, plaintiffs were the owners of a block of land in the city of Benicia,—whether land covered by water, or upland, does not appear. At any rate, it was bounded on the east by the navigable waters of Carquinez Straits, and the line of the permanent water front of the city of Benicia, established by an act of the legislature of the state, approved March 21, 1868. The defendants were attempting, under a franchise from the city of Benicia, to erect a wharf within three feet of plaintiffs' wharf, and parallel to it for about 60 feet,—that is, in the navigable waters of the straits, and beyond the water front established by law. An injunction was granted, and rightly granted. By establishing the water front, the legislature fixed a line beyond which wharves and other structures could not be extended (Yesler v. Commissioners, 146 U. S. 655, 13 Sup. Ct. 190), and fixed the lines of the highway. There was no question of riparian rights. The plaintiffs' rights were derived from the coincidence of their eastern line with the water-front line established by the legislature. If it had been further landward, the doctrine of Weber v. Commissioners would have applied.

There only remains to be considered the claim of the defendants of the dedication of Lewis street, and the claim of the plaintiff of the revocation of the dedication, by the constitution of the state adopted in 1879. To support their contention, defendants cite the act of the legislature approved March 11, 1858, entitled "An act concerning the city of San Francisco and to ratify and confirm certain ordinances of the common council of said city;" an act approved April 25, 1862, amendatory of various acts relating to the city. See St. 1862, p. 391. Section 1 of the ordinance confirmed by the first act is as follows:

"That the plan or map of the Western addition, reported by the commission created under an ordinance of the last common council of the city of San Francisco, be adopted by this board, and be declared to be the plan of the city, in respect to the location and establishment of streets and avenues, and the reservation of squares and lots for public purposes in that portion of the then incorporated limits of said city, lying west of Larkin, and southwest of Johnston streets."

Section 1 of the second act is as follows:

"All the original streets, as laid down upon the map now in the office of the city and county surveyor of the city and county of San Francisco, signed by C. H. Gough, Michael Hayes, and Horace Hawes, commissioners, and by John J. Hoff, surveyor, and generally known as the 'Van Ness Map,' and all other streets, lanes, alleys, places, or courts, now dedicated to public use, or which shall be hereafter dedicated to public use, lying between the Bay of San Francisco and Johnston and Larkin streets, including the two last named streets, are hereby declared to be open, public streets, lanes, alleys, places, or courts, for the purpose of this law; and the board of supervisors of said city and county are hereby authorized to employ the city and county surveyor to ascertain and establish the lines and width of all or any of said streets, lanes, and alleys, and the sizes of said places or courts, when they shall deem it necessary so to do."

I think this constitutes a dedication by the state. To support its contention, plaintiff cites section 2 of article 15 of the constitution of the state. It is as follows:

"No individual, partnership or corporation, claiming or possessing the frontage or tidal lands of a harbor, bay, inlet, estuary or other navigable water in this state, shall be permitted to exclude the right or way to such water whenever it is required for any public purpose, nor to destroy or obstruct the free navigation of such water; and the legislature shall enact such laws as will give the most liberal construction to this provision, so that access to the navigable waters of the state shall be always attainable for the people thereof."

Counsel say:

"The provision to which we wish to direct special attention is contained in section 2. It will be observed that this section contains two separate and distinct prohibitions. In the first place, the right of way to navigable water must not be excluded. In the second place, the navigation of the navigable water must not be destroyed or obstructed. With the first of these prohibitions, we have nothing to do. We are concerned only with the second. And, leaving out extraneous matter, this prohibition is as follows: 'No individual, partnership or corporation, claiming or possessing * * * tidal lands of a harbor, bay, inlet, estuary or other navigable water in this state shall be permitted * * * to destroy or obstruct the free navigation of such water.'"

Passing the point that titles or rights acquired could not be revoked even by an amendment of a constitution, and the further point that plaintiff cannot plead the prohibition, I do not think its contention can be sustained. The language of the constitution is directed at "individuals, partnerships or corporations;" and, besides, I cannot but believe that if it had been the intention to abridge the power of the legislature to improve the harbors and establish uniform harbor lines, as it had been the practice, and may be necessity, to do, such intention would have been explicitly declared. The order to show cause must, therefore, be discharged, the temporary restraining order vacated, and the application for injunction denied, and it is so ordered.